**MEMPHIS LIGHT, GAS AND WATER DIVISION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

United Gas Pipeline Co. and Interstate Natural Gas Association of America, Intervenors.

No. 73–1506.

United States Court of Appeals, District of Columbia Circuit.

Argued June 5, 1974.

Decided Sept. 3, 1974.

George E. Morrow, Memphis, Tenn., with whom Reuben Goldberg, Washington, D. C., was on the brief, for petitioner.

Gregory Grady, Atty., Federal Power Commission, with whom Leo E. Forquer, Gen. Counsel, George W. McHenry, Jr., Sol. and William M. Sawyer, Atty., Federal Power Commission, were on the brief for respondent.

Christopher T. Boland, James M. Broadstone and Jerome J. McGrath, Washington, D. C., were on the brief for intervenor, The Interstate Natural Gas Association of America.

William B. Cassin, Alvin M. Owsley, Jr., and Robert A. Webb, Houston, Tex., were on the brief, for intervenor, United Gas Pipeline Company.

Before FAHY, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

TAMM, Circuit Judge:

This case is before the court on petition for review of an order of the Federal Power Commission ("the Commission") granting United Gas Pipe Line Company's ("United") request for an increase in its annual depreciation rate to 5 percent. Petitioner, Memphis Gas Pipe Line Company ("Memphis"), an intervenor in the Commission proceedings, is a large, municipally-owned gas distribution company which indirectly purchases [1] gas from United. Memphis challenges the new depreciation rate on the ground that it is insufficiently supported by factual evidence. We agree

---

1. Memphis purchases all of its gas from another pipe line company which in turn ob- tains a substantial portion of its gas from United. Petitioner's Br. at 2.

with petitioner and remand the matter to the Commission.

The instant proceedings began when United filed,[2] pursuant to Section 4(e) of the Natural Gas Act,[3] for an increase in its rates and charges for its sales of natural gas for resale in interstate commerce. After negotiations among the parties, a settlement was reached with respect to all issues involved in United's rate filing except the issue of the proposed change in depreciation rate. Hearings were held on that issue.

Prior to the rate filing, United had been utilizing a composite depreciation rate of 2.88 percent. This rate had been established in 1943, based on a physical life estimate of the service lives of United's systems.[4] United proposed an increase in depreciation rate to a uniform annual rate of 5 percent for the period 1971–1976 which would be reduced in succeeding 5 year periods, with a resulting twenty year (1971–1990) average of 3.88 percent.

On February 1, 1972 Chief Administrative Law Judge (then Presiding Examiner) Zwerdling issued his Initial Decision[5] denying United's proposed increase. The Commission, on January 11, 1973 reversed the Initial Decision[6] and held that the depreciation rate to be used by United from and after January 1, 1971 through December 31, 1975,[7] would be 5 percent. Petitioner's application for rehearing was denied,[8] and this appeal followed.

It may be helpful, before addressing the facts of this particular case to examine briefly the concept of depreciation and the Commission's articulated policies with respect thereto.

Depreciation is generally defined as "the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property." Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 167, 54 S. Ct. 658, 664, 78 L.Ed. 1182 (1934).[9] The Supreme Court has long recognized that depreciation charges are a legitimate part of a utility's operating expenses.[10] In fact, the Commission enjoys an explicit grant of power from Congress to set depreciation rates for natural gas pipelines. Section 9 of the Natural Gas Act provides:

> The Commission may, after hearing, require natural-gas companies to carry proper and adequate depreciation and amortization accounts in accordance with such rules, regulations, and forms of account as the Commission may prescribe. The Commission may from time to time ascertain and determine, and by order fix, the proper and adequate rates of depreciation and amortization of the several classes of property of each natural-gas company used or useful in the production, transportation, or sale of natural gas.

2. FPC Docket No. RP71–41, filed November 13, 1970.

3. 15 U.S.C. § 717c(e) (1970) (hereafter "the Act").

4. FPC Docket No. G–148 reported at 3 FPC 402 (1943).

5. Initial Decision, FPC Docket No. RP71–41 (February 1, 1972). The decision appears at 195–207 of the Joint Appendix (hereafter J.A.).

6. Opinion No. 645 (issued January 11, 1973) (unpublished), J.A. at 226–40.

7. Id. at 240. The effective dates for the new depreciation rate were later changed to June 1, 1971 through May 31, 1976 in Opinion No. 645–A (issued March 9, 1973) (unpublished), J.A. at 243–45.

8. Opinion No. 645–A, supra note 7, J.A. at 245.

9. See generally 1 A. Priest, Principles of Public Utility Regulation 112–16 (1969); J. Bonbright, Principles of Public Utility Rates 192–223 (1961).

10. City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 29 S.Ct. 148, 53 L.Ed. 371 (1909); Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 78 L. Ed. 1182 (1934); FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

15 U.S.C. § 717h(a) (1970). Pursuant to the above-quoted provision of the Act, the Commission has adopted and published a Uniform System of Accounts for Natural Gas Companies which defines depreciation as:

> the loss in service value not restored by current maintenance, incurred in connection with the consumption or prospective retirement of gas plant in the course of service from causes which are known to be in current operation and against which the utility is not protected by insurance. Among the causes to be given consideration are wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public authorities, and, in the case of natural gas companies, the exhaustion of natural resources.

18 C.F.R. pt. 201, Definitions, ¶ 11.B. (1973).

This definition of depreciation, conveniently brings us back to the merits of the matter *sub judice*, that is, what factors or causes of loss in service value shall be given what weights in the context of the current national shortage of natural gas. In more concrete terms, the parties disagree over whether and to what extent diminished gas reserves should be considered in establishing United's depreciation rate.

United's now superceded depreciation rate of 2.88 percent was set in 1943, a time when there appeared to be abundant supplies of natural gas. Therefore, United, in keeping with industry practice, had determined the useful service life of its depreciable properties in terms of the physical life of those properties; the underlying assumption being that gas reserves would be sufficient to insure that the useful life of the properties would approximate their physical life. In recent years, however, the gas reserve situation has dramatically worsened. United submitted evidence that its reserve life index [11] had declined from 29.91 years in 1948 to 8.72 years in 1970. The new depreciation rates, proposed by United and accepted by the Commission, are based on the premise that this change of conditions, i. e., the lessening of gas reserves, requires that the potential exhaustion of natural resources now be given greater weight. In short, the Order hereunder review adopts a depreciation rate based on reserve life rather than physical life.

■ Petitioner characterizes the new depreciation rate as a "radical change" [12] which "revolutionize[s] depreciation accounting" [13] and "perverts the whole traditional concept of depreciation." [14] We cannot agree with these characterizations. In the first place, the definition of depreciation in the Commission's Uniform System of Accounts specifically identifies "exhaustion of natural resources" as one of the potential causes for loss in service value which may, in proper circumstances, be given consideration. [15] Exhaustion of natural resources is not a newly articulated component of the depreciation formula; rather, it has been a part of the depreciation formula since the Commission first promulgated its Uniform System of Accounts in 1940. [16] The Commission admits that in the past, reserves have been accorded little significance in individual cases. [17] We

11. Reserve life index is a ratio: the numerator being the company's total existing gas reserves; the denominator being the total production for a given year. The resulting figure therefore represents the number of years the company could continue to produce gas at the level of the given year if no additional gas reserves were added.

12. Petitioner's Br. at 13.

13. *Id.* at 14.

14. *Id.* at 23.

15. 18 C.F.R. pt. 201, Definitions, ¶ 11.B. (1973).

16. *See* Uniform System of Accounts Prescribed for Natural Gas Companies Subject to the Provisions of the Natural Gas Act, Order 141, 12 Fed.Reg. 8461, 8608 (December 19, 1947). While not formally codified until 1947, the system of accounts became effective on January 1, 1940. 12 Fed.Reg. at 8607.

17. Opinion No. 645 at 10, J.A. at 235.

think that the failure of the gas reserve component to play a larger role was merely the result of the then reassuringly large gas supply rather than an immutable indicium of its nugatory value as part of the depreciation formula. Indeed, at least one case, perhaps a precursor, has specifically considered exhaustion of natural resources. *See* United Fuel Gas Co., 31 FPC 1342, 1353 (1964); *see generally* Panhandle Eastern Pipe Line Co., 13 FPC 53 (1954), reversed on other grounds sub nom., City of Detroit, Michigan v̇. FPC, 97 U.S.App. D.C. 260, 230 F.2d 810 (1955), cert. denied, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956).[18]

Since exhaustion of natural resources has always been an articulated factor in depreciation calculation, and has been utilized in the past in specific factual situations where the Commission thought it appropriate, we do not accept petitioner's characterization of the Commission Order here as revolutionary.

 We now turn to the essential question presented for decision in this case: whether the new depreciation rate of 5 percent ordered by the Commission is "proper and adequate" as required by the Act. 15 U.S.C. § 717h(a) (1970). The standards of judicial review of Commission action were clearly articulated by the Supreme Court in the Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968),[19] where Mr. Justice Harlan, writing for the majority, stated:

> [T]he responsibilities of a reviewing court are essentially three. First, it

must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable.

390 U.S. at 791–792, 88 S.Ct. at 1373. Thus, while we recognize a duty to sustain Commission action which falls within a "zone of reasonableness,"[20] the Commission must articulate some rational connection between the facts found, supported by substantial evidence, and the action which it took.[21]

The Commission considered the question before it to be two-fold:

> whether United has shown that its reserve outlook is such that the life of its reserves should become a major factor in estimating the useful service life of its gas plant and, if so, whether its proposed uniform 5% rate, which would decline in approximate 5-year stages to a maximum 20-year average of 3.88%, is an appropriate allocation of depreciation.

18. *See also* Canadian River Gas Co. v. Public Serv. Comm'n of Colorado, 3 FPC 32, 47 (1942); Interstate Natural Gas Co., Inc., 3 FPC 416, 423–24 (1943).

19. This case concerned the establishment of area-wide gas producer rates. Such rates are required to be "just and reasonable" under sections 4(a) and 5(a) of the Natural Gas Act. 15 U.S.C. §§ 717c(a), 717d(a) (1970). Although *Permian* did not directly construe section 717h concerning depreciation rates, we believe that the standards established for judicial review of Federal Pow-

er Commission action are fully applicable here. The depreciation element, after all, must be "proper and adequate" if the end result, *i. e.* the rate, is to pass muster under the rubric of "just and reasonable."

20. Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

21. *See* FPC v. United Gas Pipe Line Co., 393 U.S. 71, 72–73, 89 S.Ct. 55, 21 L.Ed.2d 55 (1968) *quoting* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

Opinion No. 645 at 10, J.A. at 235.[22] Finding "that United should be allowed to increase its depreciation rate as a result of its declining reserve life index," *id.,* the Commission continued:

> On the basis that the current gas shortage and United's critically low reserve life index will not allow United to expand sales in the future as it has in the past, will probably force it to utilize much of its property at less than its full capacity, and could force it to abandon some of its property prematurely, we find it prudent and in the public interest to allow United to utilize a rate of depreciation which reflects the undeniable change in United's gas supply which has occurred since the currently effective rate of 2.88% was established in 1943.

Opinion No. 645 at 11, J.A. at 236.

■ It is clear from our discussion above that the Commission can certainly take "exhaustion of natural resources" into account in establishing proper depreciation rates. However, in any specific determination of depreciation, the Commission is obligated to ascertain the useful life of the particular piece of depreciable property involved. The substitution, as here, of a higher reserve life based depreciation rate for a lower physical life based rate will necessarily increase gas prices to current consumers. It has long been recognized that one of the primary purposes of the Natural Gas Act is to "ensure that natural gas be distributed at the lowest possible price." [23] Therefore, the Commission must make affirmative findings that the exhaustion of natural resources has caused the useful life of this particular property to be reduced to the extent that physical life (of less expense to consumers) is no longer an appropriate measure of useful life. The Commission did not clearly indicate an understanding that it must find that declining gas reserves have caused the useful life of United's property to decrease. It did however, in the passage quoted above, identify three discrete effects said to be caused by "the current gas shortage and United's critically low reserve life index." Low reserves (1) "will not allow United to expand sales in the future as it had in the past, [2] will probably force it to utilize much of its property at less than its full capacity and [3] could force it to abandon some of its property prematurely." Opinion No. 645 at 11, J.A. at 236. Petitioner contends that these findings are not supported by factual evidence, and therefore, the ultimate finding of a diminution of useful life which is based upon these findings, cannot stand. After a thorough review of the record, we agree with petitioner.

United offered evidence that while its reserve life index was at 29.91 years in 1948,[24] by 1970, it had declined to 8.72 years.[25] The decline in United's reserve life index was shown to be slightly greater than the decline in the composite reserve life index for all United States natural gas companies.[26]

**22.** It could be argued that the second half of the question necessarily includes the first in that the 5 percent rate allowed could *not* be "an appropriate [presumably meaning 'proper and adequate' within section 717h of the Act] allocation" if the evidence revealed that declining reserves would *in no way* affect the useful life of the depreciable property. As we indicated above, our view of the question presented focuses upon whether the 5 percent figure meets the statutory standard of "proper and adequate."

**23.** Atlantic Refining Co. v. Public Serv. Comm'n, 360 U.S. 378, 388, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959) ; Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 685, 74 S.Ct.

794, 98 L.Ed. 1035 (1954) ; FPC v. Hope Natural Gas Co., *supra,* 320 U.S. note 10 at 611, 64 S.Ct. 281 ; Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318, 331 (5th Cir.), cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78, rehearing denied, 385 U.S. 964, 87 S.Ct. 390, 17 L.Ed.2d 310 (1966).

**24.** United Ex. 21, Table 1, J.A. at 177 ; United Ex. 32, Schedule 1, J.A. at 192.

**25.** Testimony of Mr. Barnett of United, J.A. at 97–99. Mr. Barnett prepared and sponsored United Ex. 32, and his testimony at J.A. 97–99 served to augment Schedule 1 of Ex. 32 for calendar year 1970.

**26.** United Ex. 32, Schedule 1, J.A. at 192.

Addressing the question of the need for a higher depreciation rate, United offered the testimony of Mr. Brooks,[27] who prepared and sponsored Exhibit 21,[28] a depreciation exhibit. The exhibit is based on the assumption that United's gas transmission business will terminate in 1990. Mr. Brooks' data indicated that if the initial 5 percent rate were approved (and decreased at 5 year intervals to a twenty year average rate of 3.88 percent) United could expect to recover its present investment, together with most investments made during the twenty year period. In contrast, if the old depreciation rate of 2.88 percent were continued, and if United terminated operations in 1990, Exhibit 21 indicated that 23.52 to 37.42 percent of United's investments during the next twenty year period would remain unrecovered. Mr. Brooks testified that another United witness, Mr. Barnett, had provided him with the data relating to United's yearly gas supply, sales requirements, and volume of gas reserves to be added annually.[29] Mr. Barnett testified that his figures concerning gas reserves to be added, used by Mr. Brooks, represented the volume of gas which would be required to meet United's then (1969) existing resale contract requirements.[30] Thus, the depreciation exhibit is not based upon any forecast or prediction of the future reserves which actually may be expected to be added to United's system. The figures used, in short, make *no attempt* whatsoever to forecast the probable or even possible state of United's future reserves.

Both petitioner [31] and the Administrative Law Judge [32] stress the fact that Exhibit 21 was premised on the fact that United would cease gas transmission operations in 1990. This, they argue makes the whole exhibit irrelevant given the fact that no United witness testified that termination was even the remotest possibility. In fact, all witnesses indicated,[33] and the Commission specifically found,[34] that United would be in business well after 1990. The problem the Commission must resolve is the probable useful life of the specific pipeline systems in question.[35] Obviously, proof that a company *would* cease operations at a particular date would be relevant since it should be allowed to depreciate fully its properties by the known termination date.[36] Here, however, it is not even argued that United will terminate gas operations. The Commission must develop evidence and make findings on the only relevant question: What is the useful life of United's depreciable property? Therefore, in attacking Exhibit 21, petitioner has not stated its case with precision. The flaw in Exhibit 21 is not that it is based on a presumed termination; rather, the exhibit is of little value because it contains no data predicated on any forecast of the future reserve life index, and therefore cannot provide any support for a conclusion that the useful life of United's property has declined.

The only record evidence supporting the change in depreciation rate came from Mr. Brooks, who testified that the higher rate was needed to implement a

---

27. Direct examination of witness Brooks, J. A. at 16–35; cross-examination of witness Brooks, J.A. at 113–47; redirect examination of witness Brooks, J.A. at 148–58.

28. United Ex. 21, J.A. at 173–90.

29. J.A. at 27, 31.

30. J.A. at 32; *see* United Ex. 32, Schedule 3, J.A. at 194. The figures in Ex. 32, Schedule 3 were those used by witness Brooks in his depreciation exhibit; United Ex. 21, Table 2, J.A. at 178.

31. Petitioner's Br. at 7–9.

32. J.A. at 200.

33. Testimony of witness Brooks, J.A. at 30; Testimony of witness Barnett, J.A. at 41.

34. "[W]e do not conclude that United will not be in the gas business in 1990. On the contrary, we would expect United to be in the gas business for many years after 1990." Opinion No. 645 at 11, J.A. at 236.

35. The Commission agrees with this statement of the issue. *See* Respondent's Br. at 15.

36. *See, e. g.,* United Fuel Gas Co., 31 FPC 1342 (1964).

management decision based upon "United's experience . . . that the economic life of the property in question is much less than its physical life".[37] However, there is no record evidence to support witness Brooks' *conclusion* that the economic (useful) life of the property is less than its physical life, or that it has even diminished as a result of the declining reserve life index. We previously noted that the Commission mentioned three effects of "the current gas shortage and United's critically low reserve life index." We find no record evidence to support any one.

The Commission made the prediction that declining gas reserves "could force [United] to abandon some of its property prematurely." If there were evidence that United contemplated the abandonment of any of its property, this would, of course, have a direct bearing on the useful life of such property. However, the record contains no evidence that any United property will be abandoned prior to the exhaustion of its physical life. Indeed, if the evidence supports any inference, it is to the contrary.[38] The record, in short, does not contain evidence to support the findings offered by the Commission in support of its conclusion that the old depreciation rate had become inadequate.[39]

Further, the Commission stated that it would be impossible for "United to expand sales in the future as it had in the past." We repeat that nowhere in the record is there any estimate of United's future reserves or future gas sales. The Commission cannot reach the conclusion that the useful life of any property has diminished based only on Exhibit 21, which was prepared on an assumption not even arguably related to United's probable future. Further, even if United's sales should *"fail to increase,"* this cannot support an inference that the useful life of its property has lessened. As pointed out by petitioner,[40] the present depreciation rate was established on the basis of an estimated physical life which was not related to a prediction of ever expanding sales from 1943–1990. If sales should remain at their present rate, or even decline, this does not necessarily mean, without more supportive evidence, that the useful life of the property has declined.

We recognize that a decline in sales, if it occurs, will mean a rate increase to the consumer even though the depreciation *rate* is not increased. The amount of annual depreciation, though constant in dollars, will increase in unit cost of service, per Mcf., as the total depreciation cost is divided among a smaller number of units. The Commission now asserts that the spectre of such a situation, unsupported by any evidence that it could occur in fact, justifies the new depreciation rate. This argument cannot substitute for the requisite finding here lacking: that the useful life of United's depreciable property has in fact been reduced.

Finally, the Commission found that the gas shortage "will probably force [United] to utilize its property at less than full capacity." By this, we presume that the Commission meant less than the full capacity of individual pieces of property, *e. g.*, pipelines will carry less than 100 percent of the gas that each pipeline could carry. However, there is no evidence in the record, nor reason to assume, that the service

37. J.A. at 26.

38. *See supra* notes 33, 34 and accompanying text.

39. The Commission in its Brief makes the statement: "[T]he Company demonstrated that its then-effective 2.88% depreciation rate had become unrealistic and inadequate." Respondent's Br. at 14. In support of this statement, the Commission directs our attention to three sources: (1) Opinion No. 645 at 10, J.A. at 235; (2) Opinion No. 645 at 12, J.A. at 237; and (3) United Ex. 32, Schedule 2, J.A. at 193. Items (1) and (2) are, of course, not record evidence, but rather the Commission's conclusions. Item (3), a chart showing United's historical gas reserves 1948–1969, contains no information whatsoever relating to the adequacy of the depreciation rate. We think it significant that the Commission is unable to direct us to record evidence supporting its conclusion that the old rate had become "unrealistic and inadequate."

40. Petitioner's Br. at 14.

life of any depreciable property was originally computed on the basis that it would always be operated at 100 percent capacity. Absent such evidence, it is not relevant that a particular pipeline, for example, might now operate at less than its full capacity. There must be some evidence to establish a relationship between a diminution in operating load and a reduction in useful life of the property.

■ As we have noted above, a forecast of future decline in volume might warrant a present increase in depreciation rates, but to do so would require a projection based on evidence of probable future reserves and sales. In this case, the Commission has essentially accepted United's proposed depreciation rate as not "irrational or unreasonable." Opinion No. 645 at 13, J.A. at 238. However, it is for the Commission, not the utility, to determine a depreciation charge that is proper and adequate. The Commission cannot indulge the utility in an abstract projection which is premised on termination of service and which amounts to a "worst case" analysis. Even assuming continued serviceable life, declining use of pipeline facilities might conceivably lead in future years to depreciation dollars per unit of gas so high as to be unreasonable. The natural gas company would have a direct interest only if there were a showing that its investment in the pipeline will not be recapturable out of depreciation reserves—a showing not remotely made in the present record.[41] Otherwise, the only basis for an increase in current amounts of depreciation would be protection of future consumers, to avoid saddling them with "undue" burdens per unit of gas consumed. The current reality, however, is that the proposal will yield the company the benefit of an increase in the burden of present consumers. A current increase in their burden requires not mere fears for the future but facts and findings, a statement of

reasons that is supported by concrete inferences from substantial evidence, and is not to be snatched from the air on a purely hypothetical "worst case" analysis like that in the present record.

■ The Commission recognized, and we agree, that the decision was a difficult one which must be made, in part, by extrapolation from less than extensive empirical evidence. Opinion No. 645 states:

> We do not have available to us the complete empirical data which we would like to have in order to render this decision. We do not find fault in the fact that United did not present such data to us for, as we have indicated, the impact of the gas supply shortage is at this time largely unquantifiable. We may not, however, refuse to recognize its effect simply because the solution we must reach may be less than ideal—all alternatives open to us at this point present the same difficulty.

Opinion No. 645 at 14, J.A. at 239. The Commission now contends [42] that this court should sustain Opinion No. 645 as a proper exercise of Commission expertise in making necessary future projections, and suggests that we give great weight to the Commission's continuing ability to monitor the effects of this order and adjust the depreciation rate should it later be proved erroneous. While we recognize that agency expertise is to be accorded deference and that the Commission can correct present errors, neither of these principles can substitute for the adequate evidentiary basis upon which the Commission's finding must rest. The Commission cites Alabama-Tennessee Natural Gas. Co. v. FPC, 359 F.2d 318 (5th Cir.) cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed. 2d 78, rehearing denied, 385 U.S. 964, 87 S.Ct. 390, 17 L.Ed.2d 310 (1966), in support of its contention that a Commission prediction of future events should be

---

41. The Commission's opinion contains not even the glimmer of a thought that annual depreciation requirements would zoom so high as to be unrecapturable in fact, and

thus result in an instance of economic obsolescence.

42. Respondent's Br. at 16–20.

conclusive. The Fifth Circuit there stated:

It is true that the Commission's decision rests on its reading of the future. But clairvoyance is part of the daily grind of a regulatory agency. Whether flow-through or normalization is the rule, the agency must base the rule on some projection into the future.

*Id.* at 339. However, the court continued:

On the record before us and the facts outside of the record which the Commission properly notices, the Commission's ruling is based on *substantial evidence of present conditions and a fair guess as to future conditions in the pipeline industry.*

*Id.* (Emphasis added.) The court in *Alabama-Tennessee* clearly identified the need for record evidence as to present conditions and "a fair guess as to future conditions." The record here contains no evidence which can support an inference that the present depreciation rate is inadequate. More importantly, the Commission has developed no evidence as to future conditions. It has made no "fair guess" as to United's future reserves, and no findings at all on the present useful life of United's depreciable property.

■ We realize the question here concerns unknown future gas sales of presently unacquired future gas reserves. However, the fact remains that even in 1943, no natural gas companies enjoyed a reserve life index equal to or greater than the physical life of their plant. There is now, as there always has been, the certainty that "[t]he ultimate exhaustion of the supply is inevitable in the case of all natural gas companies." FPC v. Hope Natural Gas Co., 320 U.S. 591, 606, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944). We have no doubt that with a declining reserve life index, the risk that depletion of natural re-

sources will shorten the useful life of physical assets has increased. An eight year reserve life index logically entails more risk of future abandonment than does a 25 year index. We are not satisfied with a record that contains only a recitation of the decline of the reserve life index. In order to be "just and adequate", a reserve life depreciation rate must be based upon the useful life of the *particular property* involved. We therefore believe that it is the Commission's obligation to make some reasoned estimate of the useful life of the property here involved,[43] even though to do so would no doubt require an estimate of future reserves. We realize that such a prognostication would necessarily be only an estimate, but at least the Commission would thereby attempt to ascertain how the gas shortage had affected the useful life of this property.

■ In arriving at such a reasoned estimate, the Commission must exercise its own judgment based upon evidence pertinent to what it really expects will happen. In doing so, the Commission will, of course, have the benefit of United's submissions which, as we have indicated, must be directed to probable future conditions. In addition, the Commission should take into account current Commission policies designed to increase or to sustain industry-wide gas supply. Further, the Commission might be able to develop evidence concerning the probable extent and location of reserves which United might utilize at some future date. In this regard, we note that the United system is located in Louisiana, Texas, and Mississippi, an area containing 73 percent of the United States' total gas reserves.[44]

■ We recognize that there is no one "correct" depreciation rate; thus, the Commission could develop a range of rates which would fall within a "zone of reasonableness." Such findings would be, of course, sustained if supported by

---

43. It is possible that insufficient reserves could have a greater effect on one type of company property, or property located in one area, than on other property. In such a case, the Commission could arrive at a com-

posite depreciation rate, taking into account potentially differing useful lives, rather than as here, a uniform rate systemwide.

44. J.A. at 201. *See supra* note 43.

record evidence. *See, e.g.,* Permian Basin Area Rate Cases, *supra,* 390 U.S. at 767, 88 S.Ct. 1344. While the Commission is accorded wide latitude, its findings must, at the least, be "reasoned inferences from substantial evidence."[45]

We reiterate our statement that the Commission is certainly correct in taking into account the exhaustion of natural resources when it establishes the proper depreciation rate for a particular natural gas company. The problem in this case is that the Commission attempted to cry "shortage" and then to take action without establishing that the useful life of *this* depreciable property had been adversely affected. The Commission must attempt to identify the useful life of United's property. There must be a rational connection shown between the declining reserve life index and the Commission's response to it.

For the reasons stated above, the Order under review is reversed and the matter remanded to the Commission for further proceedings consistent with this opinion.

Reversed and remanded.

**45.** City of Chicago v. FPC, 128 U.S.App.D.C. 107, 385 F.2d 629, 637 (1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).